FILED

2011 Dec-15  AM 10:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | |
|---|---|
| CIRRUS ACQUISITION AND ) | |
| DEVELOPMENT CORPORATION; ) | |
| CIRRUS GLOBAL CAPITAL ) | |
| MANAGEMENT INC.; CIRRUS ) | |
| HOLDINGS, INC. and RICHARD ) | |
| WOODS ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| vs. ) | CV  4:10–01183–RBP |
| ) | |
| FOUR STAR COMPANIES, INC., ) | |
| DRAGON'S LAIR HOLDINGS, INC.; ) | |
| FOUR STAR HOLDING COMPANY, INC.; ) | |
| BOBBY SMITH, JR., and FRAN MIZE ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM OPINION**

This matter is before the court on defendants Four Star Companies, Inc. ("Four Star"),[1]

Four Star Holding Company, Inc., Dragon's Lair Holdings, Inc., Bobby Smith, Jr., and Fran

Mize's ("defendants") Motion for Summary Judgment filed on July 19, 2011.  Plaintiffs Cirrus

Acquisition and Development Corporation, Inc., Cirrus Global Capital Management, Inc., Cirrus

Holdings, Inc.,[2] and Richard Woods ("plaintiffs") responded to the defendants' motion on

August 26, 2011.  Defendants replied on September 19, 2011.  The court has reviewed all the

---

[1] In addition to naming Four Star Companies, Inc. ("Four Star") as a defendant to this action, the complaint also names Four Star's "related subsidiaries" as defendants.  Plaintiffs identify the following entities as Four Star's related subsidiaries: Four Star Realty, Four Star Investments, Four Star Land Ventures, Twelve Oaks Properties, Inc., Ridgfield Development, SBE, Inc., and B&B Smith Construction.

[2] Plaintiffs Cirrus Acquisition and Development Corporation, Cirrus Global Capital Management, Inc., and Cirrus Holdings, Inc. are collectively referred to as "Cirrus" unless context suggests otherwise.

briefs and submitted evidence.  Also see the transcript of the recorded October 25, 2011 hearing.

The motion is now under submission.[3]

I.      **FACTUAL BACKGROUND.**

In 2009, Richard Woods, managing partner of Cirrus, was introduced to Bobby Smith

and Fran Mize, owners and directors of Four Star, through a mutual acquaintance.  The parties

communicated frequently over the next few months, during which time Cirrus learned that Four

Star was interested in obtaining financing.  By the end of the year the parties' business

relationship had generated at least four, but possibly more, written documents.  The effect of

these documents lies at the center of this dispute.

In particular, the four documents are: (1) a Mutual Confidentiality and Nondisclosure

Agreement ("Nondisclosure Agreement") signed July 3, 2009; (2) a so-called "Retainer

Agreement" signed July 3, 2009; (3) a Letter Agreement, which is commonly referred to by the

parties as the "IB Agreement" dated July 27, 2009; and (4) a Compensation Agreement,

executed on October 17, 2009 by the plaintiffs and Novus Acquisition & Development

---

[3] Since the plaintiffs, at the October 25, 2011 hearing, acknowledged that a number of their claims lack foundation, this court could substantially reduce the following discussion.  The court will "over-address" certain matters even though not necessary to its decision in the event there is any question as to plaintiffs' concessions.  Also, there is substantial language in various documents which are contrary to the establishment of enforceable agreements.

Corporation ("Novus").[4]   Defendants Smith and Mize, on behalf of Four Star, subsequently

signed an "Acknowledgment" of the Compensation Agreement.[5]

The first "agreement" was the Nondisclosure Agreement.  The stated "Purpose" of this

agreement was "to ensure the protection and preservation of the confidential and/or proprietary

information to be shared by the parties in connection with the negotiations or discussions

relating to the provision of debt or equity financing to Four Star or one or more of its affiliates."

The stated intent of the Retainer letter is reflected in the opening paragraph:

> In response to your request for financing Cirrus Acquisition and
> Development Corporation ("CIRRUS") is pleased to propose a Lending
> relationship with Four Star Companies, Inc., Ridgefield Development and Twelve
> Oaks Properties, Inc. ("Borrower(s)"), individually and/or collectively as outlined
> below.  **PLEASE UNDERSTAND THAT THIS IS A PROPOSAL AND NOT
> A COMMITMENT TO FUND**.  Funding under this proposal is subject to a
> satisfactory audit/review of the Borrowers' books, records and operations, an
> appraisal of fixed assets, and terms and conditions of CIRRUS's Master loan
> credit approval(s) and agreement(s).

(Emphasis in original).   The sentence emphasized above was reiterated later, wherein the

Retainer letter provided:

> **THIS PROPOSAL DOES NOT REPRESENT A COMMITMENT**
> since it is subject to the satisfactory completion of our[, *i.e.*, Cirrus,] field audit,

---

[4] Actually, there are four (4) so-called "Compensation Agreements" within the parties' submissions. Chronologically, the *first* was filed along with the complaint and designated by the plaintiffs as Exhibit D.  It is between the plaintiffs and Novus; the defendants were not a party to the agreement.  The *second*, which is identical to the first, was filed as part of the defendants' motion for summary judgment and designated by the defendants as Exhibit E.  The *third* was filed as part of the defendants' motion for summary judgment as well, and it is designated by the defendants as Exhibit F.  It differs from the first two in that it is between the defendants and Novus; the plaintiffs were not a party to this agreement.  The *fourth* and final so-called "Compensation Agreement" was filed by the plaintiffs along with its Motion for Leave of Court to Substitute Exhibit "D" to Plaintiffs' Complaint, *i.e.*, the first document discussed above, which the court granted.  In support of their motion for leave, the plaintiffs asserted "that the original executed agreement was accidentally omitted from the original filing."  To be sure, this agreement is identical to the first two "Compensation Agreements," except it contains defendants Smith and Mize's signatures after an "Acknowledgment."

[5] The fact that documents may be referred to as "agreements" should not suggest that they are necessarily enforceable agreements.

> credit investigation and analysis and final approval by our counsel and senior management.  This proposal letter cannot be relied upon by, nor is it intended to benefit, any party other than the proposed Borrower.

(Emphasis in original).  The Retainer letter also specifically addressed a number of items relating to the parties' respective obligations and the terms of the proposed loan.  Such terms included, *inter alia*: (i) a maximum loan amount of $32,000,000; (ii) a $50,000 a deposit or retainer to cover Cirrus's initial expenses; (iii)  "an origination fee of 2.5 points . . . . *deemed earned [by Cirrus] at closing*;"[6]  and (iv) Four Star's promise to "reimburse all reasonable costs and out-of-pocket expenses CIRRUS incurs in connection with the contemplated transaction."  (Emphasis added).   Finally, the "agreement" expressly conditioned future performance upon certain contingencies, one of which stated: "Approval is subject to approval of the Oversight Stipulation Agreement(s) and all other approvals necessary to protect creditor's interests."

On or about July 27, 2009, Cirrus sent Four Star a Letter Agreement, which the parties refer to as the "IB Agreement."  Importantly, this document is not signed by either party.  Its stated purpose was to confirm the parties' understanding that Woods and Cirrus were to act as Four Star's financial consultants in connection with:

> (1) the identification, due diligence and acquisition of a controlling interest in a publicly traded entity ("public entity"); (2) the legal and financial work necessary to successfully merger CLIENT with the public entity; (3) the legal, financial and accounting work necessary to make CLIENT a fully reporting company; (4) the initial placement by the Company of securities associated with an equity financing in the amount of up to $25,000,000 of common stock (the "Equity Securities") if deemed necessary by CLIENT; (5) the maintenance and timely reporting requirements of all exchange, regulatory and governing bodies of a

---

[6] The phrase "2.5 points" means 0.025%.  A "basis point" is "[a] unit that is equal to 1/100th of 1%, and is used to denote the change in a financial instrument."  *Basis Point (BPS) Definition*, INVESTOPEDIA, http://www.investopedia.com/terms/b/basispoint.asp#axzz1Yllbz3rF (last visited Sept. 22, 2011).  "The basis point is commonly used for calculating changes in interest rates, equity indexes and the yield of a fixed-income security."  *Id.*  Note the clause "deemed earned *at* closing.

> publicly reporting and trading entity(s) listing on either the bulletin board, American stock exchange or such other exchange as the parties shall agree; (6) the Debt round of placement by the Company of securities associated with an equity financing in the amount of up to $100,000,000 of Debt Securities on terms and conditions commensurate with the required capital to fund the plan of the newly merged business interests.

The document then specifically identifies sixteen (16) "services to be performed by the Advisor," *i.e.*, the plaintiffs, as well as provisions addressing Cirrus's compensation and expenses.

The final purported agreement is the so-called Compensation Agreement.  It is between the plaintiffs and a company called Novus.[7]  It states that Woods had identified a publicly traded company, Dragon's Lair Holding, Inc., which met the conditions of the IB Agreement.  In regards to Cirrus' compensation, it states:

> *At the time of closing between 4STR and Dragons Lair Holding, Inc.*; Cirrus as part of its fees due from 4STAR shall receive a net shareholder position of approximately 540,000 shares or 6% of all outstanding shares of DRGA, *at the time of closing*; In turn, Cirrus/Woods shall issue to NDEV 25,000 shares Free Trading and 75,000 shares restricted with piggyback rights to any registration for providing for the Novus' Conditional commitment to Fund with; And Cirrus/Woods, via its agreement with 4 Star, will have earned its 6& equity stake in DRGA and that Cirrus/Woods agrees that *at the time of closing* with Dragons Lair Holding, Inc. that all shares of Dragons Lair Holdings, Inc shall be deemed earned and unencumbered and in turn the Novus Shares will be deemed earned and unencumbered.  (Emphasis added).

Although the defendants did not sign this agreement, its principals signed an "Acknowledgement" at the end of the agreement, which states:

> Acknowledgement of agreement where Shares are *earned by Woods et. al. at closing* of shell acquisition and separately acknowledging facilitating debt/equity funding of *not less than $35M* under *mutually agreeable* debt/equity financing terms.  (Emphasis added).[8]

---

[7] Novus is not a party to this case.  Its full name is Novus Acquisition & Development Corp.

[8] Note another reference to "time of closing."  Also note, "not less than 35M" and "mutually agreeable."

## II.   PROCEDURAL HISTORY.

On May 6, 2010, the plaintiffs commenced this action, asserting ten (10) counts against the defendants: (1) Breach of IB Agreement; (2) Breach of Compensation Agreement; (3) Breach of Retainer Agreement; (4) Specific Performance; (5) Work and Labor Done; (6) Money Lent; (7) Unjust Enrichment; (8) Breach of Fiduciary Duty; (9) Negligence; and (10) Wantonness.[9]   Plaintiffs attached the four agreements discussed as exhibits to their complaint.

On June 9, 2010, defendants filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment.   After the matter was fully briefed and a telephone conference was conducted, the court denied defendants' motion on August 3, 2010.   Thereafter, on December 14, 2010, defendants filed an Answer and Counterclaim, to which plaintiffs responded on January 7, 2011.

After the discovery process culminated, defendants filed their present Motion for Summary Judgment on July 19, 2011, seeking dismissal of all ten (10) counts in the plaintiffs' complaint.[10]   Before responding to the defendants' motion, plaintiffs filed a Motion for Leave of Court to Substitute Exhibit "D" to Plaintiffs' Complaint on August 22, 2011 which the court granted the following day.   Plaintiffs then filed their Memorandum in Opposition to Defendants' Motion for Summary Judgment on August 26, 2011 and defendants filed their Reply Brief on September 19, 2011.

## III.   SUMMARY JUDGMENT STANDARD

---

[9] The plaintiffs' complaint includes two (2) counts that are styled as "Count IV."   This typographical error is corrected above by renumbering the subsequent counts, *i.e.*, the second "Count IV" through "Count IX."

[10] Neither party has raised an argument regarding the defendants' two (2) counterclaims, *i.e.*, breach of contract and fraud.   Consequently, neither is presently before the court.

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[11]  The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks and citation omitted).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *See id.* at 322-23.  Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks and citation omitted).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, it may not merely rest on the pleadings.  *Id.*  "[T]he plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is

---

[11] Even though Rule 56 was amended in 2010, "[t]he standard for granting summary judgment remains unchanged."  Fed. R. Civ. P. 56 advisory committee's note (2010 amendments).

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c).  The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

At this stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52; *see also Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 745 n. 11 (1983).  The nonmoving party, however, "must do more than show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249; *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).  Further, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  *Anderson*, 477 U.S. at 254.  Even so, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the province of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in its favor.  *Id.* at 255. The non-movant need not be given the benefit of every inference, however; only of every *reasonable* inference.  *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

IV.    ANALYSIS.

As the defendants state, "[t]his is a case in which [the plaintiffs] claim that Defendants have breached contracts for the provision of debt and equity financing for several associated companies that Defendants control." The question in this case is whether any of the four purported agreements between the parties rise to the level of an enforceable agreement under Alabama law.  The subsequent discussion will address each agreement separately, beginning with the parties' respective arguments.

A.    **Breach of Contract (Counts I, II, & III of Plaintiffs' Complaint).**

1.    *Nondisclosure Agreement.*

The plaintiffs do not claim the defendants breached the Nondisclosure Agreement.  On the other hand, Woods stated during his deposition that the defendants breached this agreement by hiring Frank Labrozzi and Marvin Jackson.  But since the plaintiffs do not make such a claim within their complaint, any issue regarding whether the defendants breached the Nondisclosure Agreement by hiring Labrozzi or Jackson is not properly before the court.  Even if it were, the Nondisclosure Agreement specifically states: "The receiving party shall hold in strict confidence and *shall not disclose Confidential Information to anyone other than the receiving party's legal or financial advisors* who abide by the confidentiality obligations of this Agreement and who use the Confidential Information solely for the Purpose."  (Emphasis added).  Here, the defendants contend that both Labrozzi and Jackson were acting as advisors to the defendants, which is expressly permitted under the Nondisclosure Agreement, and the plaintiffs do not argue otherwise.

2.    *IB Agreement (Count I).*

Defendants argue that the plaintiffs cannot base any claim upon the IB Agreement for two separate reasons.  First, defendants contend that the IB Agreement is subject to and void under Alabama's Statute of Frauds.  *See* Ala. Code § 8-9-2 (1975).  Second, defendants contend that "it is an unenforceable contract to affect a securities transaction without being licenced [sic] as a securities broker or dealer," which violates Section 15(a)(1) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78o(a)(1) (2006).

(a).    Alabama's Statute of Frauds.

Defendants argue that three subsections of the Alabama's Statute of Frauds are implicated by the IB Agreement, and that each renders it unenforceable as it is undisputed that no party signed the agreement.  Section 8-9-2 of the Alabama Code provides in pertinent part:

> In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and *subscribed by the party to be charged therewith* or some other person by him thereunto lawfully authorized in writing:
>
> (1) Every agreement which, by its terms, is not to be performed within *one year* from the making thereof;
>
> . . . .
>
> (7) Every agreement or *commitment to lend money*, delay or forebear repayment thereof or to modify the provisions of such an agreement or commitment except for consumer loans with a principal amount financed less than $25,000;
>
> (8) Notwithstanding Section 7-8-113, every agreement for the *sale or purchase of securities* other than through the facilities of a national stock exchange or of the over-the-counter securities market.

Ala. Code § 8-9-2(1), (7), (8) (emphasis added).

As to subsection (1), defendants cite the text of the IB Agreement, which, under the heading "Compensation," provides:

> Advisor[, *i.e.*, the plaintiffs,[12]] will be paid a monthly of 25,000 per month plus expenses for 2 years post merger plus options/warrants to *be mutually agreed to by the Client and advisor prior to closing* on proposed acquisition/merger. (Emphasis added).

"By definition," defendants argue, "this provision . . . would take over one year to perform." Therefore, the IB Agreement is void because the defendants, *i.e.*, "the party to be charged therewith," did not sign it.

With regard to subsection (7), defendants quote the following provision of the IB Agreement:

> The services to be performed by the Advisor shall include, but not be limited to:
>
> . . . .
>
> (n)  Subsequent to any such listing as identified in (k)[[13]] above, Advisor will assist CLIENT in securing additional funding up to 100 million dollars ($100,000,000) (Note: this funding may be in stages in such amounts, intervals and valuations as Advisor *and CLIENT shall mutually agree*[)]; (Emphasis added).

As such, the defendants maintain that the IB Agreement "is a commitment to lend money . . . which is unenforceable unless signed by the party to be charged."

Finally, concerning subsection (8), defendants quote the following provision of the IB Agreement, which appears under the heading "Initial Structure":[14]

---

[12] The IB Agreement defines "Advisor" as: "Cirrus Global Investments and its principal, specifically Richard Woods, and its successors and assigns as appropriate, (the 'Advisor')."

[13] Item (k) states: "Identifying sources of initial investment in CLIENT after the business combination as CLIENT shall deem necessary."

[14] Note the repeated references to matters *to be* "mutually agreed" upon.

> The structure of the company following the initial business combination shall include 90% of the issued and outstanding common shares[.]  *Advisor will retain 5% and the remaining shares will make up the public Float before any new issuance from the securities offerings.*

(Emphasis added).  Defendants conclude by stating: "[p]utting aside whether [Woods's] labors actually produced anything of value for the company, this is an agreement for the purchase of securities.  It was never signed, and must fail."

In their response, plaintiffs fail to rebut any of the defendants' preceding claims concerning the Statute of Frauds.  However, the plain language of the IB Agreement indicates that: (1) the "agreement" was signed by neither the plaintiffs nor the defendants; and (2) two of the three subsections in the Statute of Frauds cited by the defendants apply, causing the IB Agreement to fall within the statute's purview.

First, Alabama's Statute of Frauds "requires the signature of the party against whom enforcement is sought . . . ."  *So. United Fire Ins. Co. v. Howard*, 775 So.2d 156 (Ala. 2000) (citations omitted).  The copy of the IB Agreement plaintiffs filed along with their complaint was subscribed to by no one, much less the defendants.  While Alabama's Statute of Frauds does not require a formal or even complete contract, it does require a *signed* writing.  *See Bunch v. Garner*, 94 So. 114, 115 (Ala. 1922) ("This contract does not comply with the statute of frauds . . . because the contract was not subscribed to by [the party sought to be charged therewith] or some other person by him thereunto lawfully authorized in writing. . . .  It was subscribed to by no one.").

Second, two provisions of the Statute of Frauds apply to the IB Agreement. The agreement entitled Mr. Woods to be paid "$25,000.00 per month for two years, post merger."

"[B]y its terms," the agreement's two-year compensation provision cannot "be performed within one year." Ala. Code § 8-9-2(1); *see also Selby v. Quartrol Corp.*, 514 So.2d 1294, 1296 (Ala. 1987) ("[A]n oral three-year employment contract would violate the Statute of Frauds."); *Sullivan v. Walther*, 546 So.2d 702, 705 (Ala. 1989) ("The very nature of the alleged agreement is a 10-year warranty, and, therefore, it falls within the Statute of Frauds."). Further, it may be an "agreement for the sale or purchase of securities." Ala. Code § 8-9-2(8); *see Fausak's Tire Center, Inc. v. Blanchard*, 959 So.2d 1132, 1138 (Ala. Civ. App. 2006) stating the legislature amended subsection (8) "to make its requirements applicable to agreements for the salr or purchase of securities other than a stock exchange or the over-the-counter market" (citation omitted)). [15]

Regardless of subsection (7)'s arguable inapplicability, subsections (1) and (8) of the Statute of Frauds appear to apply. *See Southland Bank*, 21 So.3d at 1209 ("There being no valid contract, there can be no action for breach of contract.").[16] Further, plaintiffs failed make any

---

[15] *See also Byrd v. Bentley*, 850 So.2d 232, 237-38 (Ala. 2002) (Except for "transactions in the organized securities market, e.g., the sale or purchase of securities through a stock exchange or the over-the-counter securities market," in which case § 7-8-113 applies, "all other agreements are subject to Alabama's general Statute of Frauds.").

[16] The court recognizes that the defendants did not raise the statute of frauds as an affirmative defense in their answer. In some instances, affirmative defenses not raised at the pleading stage are deemed waived. *See Chilivis v. SEC*, 673 F.2d 1205, 1208 (11th Cir. 1982) ("Fed. R. Civ. P. 8(c) requires a defendant to allege all affirmative defenses in a responsive pleading and the failure to do so will normally result in waiver." (citation omitted)). Eleventh Circuit precedent, however, recognizes an exception to the this rule: "[a] court may consider an affirmative defense that did not appear in the answer, if the plaintiff has suffered no prejudice from the failure to raise the defense in a timely fashion." *Miranda de Villalba v. Coutts & Co. (USA) Int'l*, 250 F.3d 1351, 1353 (11th Cir. 2001) (citation omitted); *see also Navarro v. Santos Furniture Custom Design, Inc.*, 372 Fed. Appx. 24, 27 (11th Cir. 2010).

In this case, plaintiffs were likely aware of defendants' intent to raise the statute of frauds in their motion for summary judgment due to the nature of questioning Richard Woods received during his deposition. Even so, permitting defendants to raise the affirmative defense does not appear to have prejudiced the plaintiffs because they did not raise an objection in their response. *See Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797-98 (11th Cir. 1989) (stating one reason defendant was not found to have waived a statute of limitations defense by first raising it in a motion for summary judgment was because "plaintiff does not assert any prejudice from the lateness of the pleading").

argument on this point, thereby also failing to "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks and citation omitted).

        (b).     <u>Federal Securities Laws.</u>[17]

Alternatively, defendants argue that "even if the parties had reached an agreement, it is void, and therefore unenforceable by [the plaintiffs] because it would be an attempt to engage in a securities transaction by an unlicensed person in violation of" Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1). In other words, defendants argue: "It is undisputed that Mr. Woods . . . . holds no broker or dealer license for securities,"[18] and "[t]he United States Code prohibits Mr. Woods from engaging in just the sort of transaction he attempted to engage in, in this case, without a license." (Internal citations omitted). Section 15(a)(1) of the Exchange Act provides in pertinent part:

> It shall be unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect (sic) any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section.

---

[17] This court will not decide this argued defense but will relate the arguments of the parties with reference thereto.

[18] In support of their contention that Woods was an unlicensed securities broker, defendants cite the following exchange between defense counsel and Woods during his deposition:

Q.      What you were doing, you didn't have to take any of that. Okay. Do you hold any licenses?
A.      No.
Q.      You do not hold a broker dealer license?
A.      No.
Q.      Never have?
A.      Yes, I have.
Q.      When did you hold a broker dealer license?
           A.      '86, '7 – '85, '6, and '7. And not a broker dealer, but a broker's license, Series 7, 63.

As to whether Woods qualified as a "broker or dealer" within the meaning of the Exchange Act, defendants cite the following test:

> In determining whether a particular individual or entity falls within this definition, courts consider whether the individual may be "characterized by 'a certain regularity of participation in securities transactions at key points in the chain of distribution.'" *SEC v. Hansen*, No. 83 Civ. 3692, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984) (quoting *Massachusetts Fin. Services, Inc. v. Securities Investor Protection Corp.*, 411 F.Supp. 411, 415 (D. Mass.) *aff'd*, 545 F.2d 754 (1st Cir. 1976)); *see also SEC v. Margolin*, No. 92 Civ. 6307 (PKL), 1992 WL 279735, at *5 (S.D.N.Y. Sept. 30, 1992) ("brokerage" conduct may include receiving transaction-based income, advertising for clients, and possessing client funds and securities). Courts also have considered whether the individual:
>
>> 1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors.
>
> *Hansen*, 1984 WL 2413, at *10 (citations omitted). . . .

*SEC v. Martino*, 255 F.Supp.2d 268, 283 (S.D.N.Y. 2003). Claiming Woods's conduct in conjunction with the IB Agreement establishes all but one of the six (6) factors outlined above,[19] defendants argue that "[t]here is no question that Mr. Woods meets these criteria."

The effect of Woods's violation of Section 15(a)(1), defendants argue, is "that any contract for the provision of such services is void." To support this proposition, defendants cite Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b) (2006), which states:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in

---

[19] Particularly, defendants note that the first factor is not present in this case, stating "Woods was not to be an employee of the issuer . . . ."

violation of, any provision of this chapter or any rule or regulation thereunder, shall be void

> (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and

> (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation . . . .

In essence, defendants assert that Section 29(b) provides "the vehicle through which private parties may rescind contracts that were made or performed in violation of other substantive provisions." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 205 (3d Cir. 2006) (citation omitted). Plaintiffs once again fail to respond to the defendants' argument within their response.

Defendants further argue "Because [Woods] admits that he is not a registered as a broker or dealer, the issue is whether [he] had the status of a broker or dealer during the course of the transactions between [Four Star] and [Cirrus]." *Salamon v. Teleplus Enters., Inc.*, No. 05-2058 (WHW), 2008 WL 2277094, at *8 (D.N.J. June 2, 2008). As to how one determines whether an individual qualifies as a broker under Section 15(a)(1), "courts have identified a number of factors." *DeHuff v. Digital Ally, Inc.*, No. 3:08CV327TSL–JCS, 2009 WL 4908581, 3 (S.D. Miss. Dec. 11, 2009) (citations omitted).

### 3.   *Retainer Agreement (Count III).*

While defendants concede that both parties signed the Retainer Agreement, they contend that it is unenforceable as well. In sum, defendants assert that the Retainer Agreement is: (1) an unenforceable agreement to agree; and (2) Woods never performed. First, the defendants state

that "it is [s]imply an agreement retaining Woods, in an at risk capacity, that would require further agreements to be operative for him to be entitled a fee."   The chief provision of the Retainer Agreement that defendants cite to support this view states:

> **PLEASE UNDERSTAND THAT THIS IS A PROPOSAL AND NOT A COMMITMENT TO FUND**.   Funding under this proposal is subject to a satisfactory audit/review of the Borrowers' books, records and operations, an appraisal of fixed assets, and terms and conditions of CIRRUS's Master loan credit approval(s) and agreement(s).

(Emphasis in original).   Defendants argue: "Black letter law is that, 'An agreement to agree later is unenforceable.'"   *See Howard v. Ryder Truck Rental One Way*, 624 So.2d 169, 170-71 (Ala. 1993); *Dixieland Food Stores, Inc. v. Geddert*, 505 So.2d 371, 373 (Ala. 1987).   For the Retainer Agreement to become operative, defendants maintain, "The parties would have had to agree on loan terms, and Woods would have had to have later been satisfied through his audit of the financial position of Four Star.   These things never happened."   In addition, defendants also assert that "[e]ven Mr. Woods recognized the contingent nature of this agreement," quoting answers from Woods's deposition wherein he stated the following with regard to the Retainer Agreement:

> Q.   Okay.   So what you say is this agreement was actually an agreement to negotiate and further agree to actual interest terms in the future?
>
> A.   No, that's not what it says.   It says based on current conditions my spread, again, was going to be what my spread was relative to my cost to capital. Because they waited or took six months in providing me with the material needed to consummate a transaction, interest rates in the market conditions changed.   We agreed long-term, and there is a number of correspondence in reference to this thing, that we changed the rate.   The reason why we went to ten and a half and were able to lock in at that is because we were also issuing warrants on the debt.   *So you can tell me that that's binding, but it's not.   There's a number of communications.   I don't believe the agreement is binding, first of all, stand alone.*

Secondarily, based on communications between Bobby, Fran and myself, it was agreed that the rate was going to be ten and a half percent and that we were buying that rate because we were issuing warrants with the debt.

. . . .

Q.     When you said "I don't believe the agreement is binding stand alone."

A.     Right

Q.     What agreement were you referring to?

A.     The agreement in reference to the terms that you're spelling out and saying that they are absolute. *Again, if you read the language it says proposed, not a commitment.*

Q.     My question is when you said --

A.     I was referring to this document.

Q.     Exhibit B to your Complaint?

A.     To the Complaint.

Q.     And you said that this agreement is not binding stand alone?

A.     Meaning that the rate that you're quoting, the term -- I mean, there were modifications.  The five-year was an immediate mistake, and it was brought to my attention the next day. I sent out an e-mail correcting it. They acknowledged the e-mail. *So is it binding as it's written? Absolutely not.*  Is the general terms, meaning we're going to provide X number of dollars based on a loan with reporting requirements, yeah, those things were, in general, locked in.  The interest rate is a market condition.  Again, if they could have provided me the audited financials in 30 days, we could have probably locked up the capital for that rate.

Q.     In other words, in order for this agreement, Exhibit B to your Complaint, to be binding, you had to have some later agreement on some other terms?

A.     You had to have final documents, which we submitted, and, again, I believe were reasonable and in line with what we presented here.  Again, my thought, based on the agreement, if there was a difference in the opinion of how it was stated, it was a negotiable point.  It was not an accept or walk away period, end of conversation.

Q.      So you had kind of an agreement to agree, is that what you had?

A.      What we had was, and as I explained to Bobby, Fran, Clay, Bill Ellison, Lee Vans, Jerry Tucker, the whole group, was *the purpose of this agreement was to commit them so they wouldn't be shopping our deal against others*, endowment to us that we would work mutually to provide the financing or obtain the financing to help facilitate their organization. That was the purpose of this agreement.

        Again, the purpose of the rate, as I explained to them, was based on the conditions of the market.  And as a wholesaler, I have to assess -- that's what we really are, wholesalers -- I have to assess the overall market, what the market will bear, and what we can offer.  If we went straight on interest rate, there is no way we could have done it at ten and a half percent, unless they put up all the reserves, which they couldn't do.

(Emphasis added).

Defendants further argue that the Retainer Agreement is "indefinite in that Woods equates it with a loan agreement, but it does not even specify an interest rate."  To the contrary, defendants contend that it "merely states that the loan to be provided, 'shall not [to] exceed $32,000,000 . . . .' [and] that, 'Interest will be paid monthly at the determined rate of interest.'" Defendants argue that this violates a basic tenet of contract law; namely, "In order for a contract to be enforceable, it must be sufficiently definite in all of its terms and conditions."  *See Howard v. Ryder Truck Rental One Way*, 624 So.2d 169, 170-71 (Ala. 1993).

In addition, defendants aver that the Retainer Agreement "has further contingencies," and it cites two examples.  First, they quote a provision that states: "Approval is *subject to* approval of the Oversight Stipulation Agreement(s) and all other approvals necessary to protect creditor's interests."  (Emphasis added).  Second, they quote the following provision:

**THIS  PROPOSAL  DOES  NOT  REPRESENT  A  COMMITMENT**
since it is *subject to* the satisfactory completion of our field audit, credit investigation  and  analysis  and  final  approval  by  our  counsel  and  senior

management.  This proposal letter cannot be relied upon by, nor is it intended to benefit, any party other than the proposed Borrower.

(Emphasis in italics added).

Second, defendants contend that "for the 'Proposal' to have any field of operation, the parties had to agree in the future upon an actual loan transaction. . . .  This never happened." Relatedly, defendants argue "that Woods/Cirrus had an agreement that they would attempt to procure financing for Four Star."  And because "payment was contingent upon the provision of financing by Cirrus/Woods,"—a contingency defendants argue never occurred—"the fact of the matter is that, even if this agreement were enforceable, Woods would be entitled to 2.5% of nothing."

In response, the plaintiffs argue that the Retainer Agreement is sufficiently definite and that the reason the loan was not consummated was because the defendants unreasonably withheld approval, in contravention of the Retainer Agreement's terms.  As to the interest rate specifically, the plaintiffs point out that it was "easily discernable and exact" because the agreement provided:

> Interest will be Variable at 600 basis points over prime adjusted quarterly to the quoted rate in the Wall Street Journal, currently 3.25% or 9.25% to borrower. The loan rate shall not increase by more than 200 basis points per annum with a cap or maximum rate not to exceed 13.5% for term of loan.  If borrower prepays principal balance outstanding prior to term loan expiration and other than through the normal course of business and lot sales, Lender will impose a prepayment penalty of 200 basis of principal amount outstanding at time of prepayment.

In light of the foregoing loan provision, the plaintiffs argue that "the rate could easily be calculated at any time."  At bottom, the plaintiffs maintain that they "submitted normal loans that were reasonable and customary for the proposed transaction and the Defendants

unreasonably withheld completing the transaction."   On this point, the following exchange occurred between Woods and defense counsel during his deposition:

Q.   How much money did you bring to Cirrus?

A.   Nineteen point five million.

Q.   When did they receive the nineteen point five million dollars?

A.   February 2nd, 3rd, 4th, 5th, somewhere in that date range.

Q.   From whom?

. . . .

Q.   Who gave them the nineteen point five million dollars?

A.   Through Cirrus.

Q.   Who gave them the money?

A.   Through Cirrus.

Q.   Cirrus gave them nineteen point five million dollars?

A.   Offered to give them nineteen point five.  They refused to go forward.

Q.   But my question is: Did they get a check for nineteen point five million dollars?

A.   No.

### 4.   *Compensation Agreement (Count II).*

Defendants contend that the Compensation Agreement is unenforceable for three reasons. First, the defendants assert that "[t]he agreement is not even between the Plaintiffs and Defendants."  In other words, defendants argue that "no Defendant is a party to this agreement." Defendants support this assertion with the terms of the Compensation Agreement; specifically, defendants quote the opening paragraph of the Compensation Agreement, which states:

This Agreement is made effective and executed as of the date below *by and between Novus Acquisition & Development Corp and Cirrus Holdings, Inc. and Richard Woods*, individually and collectively, and both parties agree to terms and conditions set forth hereinafter referred to as Agreement.

(Emphasis added).

In response, the plaintiffs contend that the defendants signed an acknowledgement at the end of the Compensation Agreement, which states:

Acknowledgement of agreement where Shares are earned by Woods et. al. at closing of shell acquisition and separately acknowledging facilitating debt/equity funding of not less than $35M under *mutually agreeable* debt/equity financing terms: (Emphasis added).[20]

In their reply brief, defendants further argue that they were never a party to the Compensation Agreement, and that the plaintiffs have not made an argument that the agreement is enforceable because the defendants are third party beneficiaries.

**B.    The Other Counts in Plaintiffs' Complaint, *i.e.*, Counts IV to X.**

In this regard, defendants divide their subsequent arguments as to each of the remaining counts in the plaintiffs' complaint.  The plaintiffs, on the other hand, do not respond to any of the defendants' arguments, except for those in relation to Count VIII, Breach of Fiduciary Duties.

***1.    Count IV: Specific Performance.***

Count IV of the plaintiffs' complaint requests specific performance under both the IB Agreement and Compensation Agreement.  In essence, Count IV requests "that five percent of the outstanding shares of Dragon's Lair (now Four Star Holdings, Inc.) which existed as of December 14, 2009, be Ordered by the Court transferred unencumbered as agreed."  Defendants,

---

[20] It is not clear how purportedly offering a $19.5 million dollar loan is "not less that $35M."  Further, the "Promissory Note" provided to the court by the plaintiffs calls for $3,060,00.00, not $19.5 million.  It is certainly not clear from any evidence that any specifically agreed  loan was ever proffered.

on the other hand, argue that this claim must fail because "if no breach of contract is proved, the specific performance claims must fail also."

### 2.    *Count V: Work and Labor Done.*

Count V raises a claim for "Work and Labor Done."  Specifically, plaintiffs aver that it "performed substantial work over the course of approximately 8 months, for which they have received no compensation."  Defendants contend that plaintiffs have "no viable contractual claim to be compensated beyond [the] initial retainer" because the work was at risk and "[t]hat risk failed to produce any revenue."

### 3.    *Count VI: Money Lent.*

Count VI of the plaintiffs' complaint raises a claim for "Money Lent."  In layman's terms, plaintiffs allege: "During the course of performing work at Defendants' request, the Cirrus parties and Woods did incur related expenses which were fronted in *expectation* said sums would be repaid by the Defendants."  (Emphasis added).[21]  Defendants, however, argue that "[e]xpenses are not personal time as explained in the Retainer Agreement," and further aver that it paid for the creation of the shell corporation and the attorneys fees incurred by taking the company public.  Finally, defendants state that "absent a contract, there was no contractual obligation to pay expenses."

On this point, the plaintiffs argue that the Retainer Agreement provided for expenses. The specific provision the plaintiffs refer to states:

> Borrower will reimburse all reasonable costs and out-of-pocket expenses
> CIRRUS incurs in connection with the contemplated transaction including, but
> not limited to, audit fees and expenses, search fees, legal fees, and any other

---

[21]:Expectation" is not enough.

reasonable fees and expenses, *regardless of whether final terms and conditions are mutually agreed upon.* Such expenses shall be paid to *use upon demand, together* with such advance funds on account of such as we may, from time to time, reasonably request.   Lender agrees to limit out-of-pocket expenses to $50,000.00 if *mutually agreed* upon terms for providing said facility cannot be reached by the parties for which neither party will unreasonably withhold approval of terms that would be normal and customary for the proposed transaction(s).  (Emphasis added).[22]

Further, the plaintiffs quote the following exchange between Woods and defense counsel during

Woods's deposition wherein he discusses hiring a subcontractor:

Q.      You don't recognize a difference between cost out-of-pocket expenses and labor expended?

A.      I do – I do recognize certain costs out of pocket and labor expenses, but labor, again, is a subcontractor, which I didn't need to bring in.  I did it to held facilitate the transaction on behalf of Four Star.  Didn't need to be incurred upon me.  The only reason we did it is because we had a compensation package that was paying us in shares down the road.  Otherwise, I would never have done for the – for the rate we charge what we did.  It was part of the overall compensation that we get the fixed rate plus the stock.  Otherwise, we would never have – I mean, one man would have been billing forty thousand a month, not twenty-five.

Q.      But my question is: Under this agreement – under this agreement, you've got – I'm trying to see how – you know, how – how you get paid, and Ive got a financing fee and then I've got – I've got expenses.  Okay?  And are you claiming that the hours expended fall under the expenses paragraph of Exhibit B to your complaint?

A.      Yes.

Q.      Are they are out-of-pocket expenses?

A.      You know, contemplated includes – it says but not limited to audit fees –

Q.      I understand that.

---

[22] Note that this provision would suggest that there is no enforceable agreement unless "mutually agreed" upon.

A.     -- and expenses, search fees, legal fees, and other reasonable fees and expenses, regardless of whether the terms and conditions – are mutually met, reasonable fees.

### 4.     *Count VII: Unjust Enrichment.*

In Count VII of the plaintiffs' complaint, plaintiffs claim that "Defendants breached the agreements with Plaintiffs and were *unjustly enriched* at the expense of Plaintiffs."  (Emphasis added).  Plaintiffs allege their work, *inter alia*, "gave Defendants the ability to raise capital and obtain financing" as well as "uncovered over 10 million in previously unbooked assets, discovered several million dollars of theft . . . and further led to Defendants' acquisition of additional properties and companies." Defendants respond that since the plaintiffs pursue a contract claim in this case, "[t]hey cannot at the same time pursue an unjust enrichment claim." *See Sullivan v. Mazak Corp.*, 805 So.2d 674 (Ala. 2000) (See, J., concurring in part and dissenting in part) ("A party cannot recover on a claim of unjust enrichment where there is an enforceable express contract between the parties concerning the same subject matter on which the unjust-enrichment claim rests." (citation omitted)).[23]

### 5.     *Count VIII: Breach of Fiduciary Duty.*

Count VIII of the plaintiffs' complaint maintains that defendants "breached their fiduciary duty to Plaintiffs."  This claim, however, is premised upon plaintiffs' view that it is "the rightful owners of 5% of the outstanding shares of Dragon's Lair (and therefore Four Star) upon the closing on Dragon's Lair."  And due to plaintiffs' *alleged* partial ownership of Four Star, it claims defendants breached their fiduciary duties: (1) "by failing to consult Plaintiffs

---

[23] Defendants' brief fails to denote that in *Sullivan* the Alabama Supreme Court affirmed the circuit court's judgment without opinion, and that the statement it quotes in support of its present position is from Justice See's partial concurrence and partial dissent.  *See Sullivan*, 805 So.2d 674.

with regard to various decisions being made on behalf of Dragon's Lair, and its successor Four Star Holdings;" (2) by "ma[king] decisions detrimental to the Plaintiffs' shares including decisions as to the initial stock price and float;" (3) by "failing to properly compensate and reimburse Plaintiffs;" and (4) by "failing to cause the subject shares to be transferred to the Cirrus parties and Woods as agreed, knowing said failures would subject the corporation to legal action and result in waste of corporate assets."

Defendants, on the other hand, argue that their relationship was "an arms-length transaction between business people" and does not rise to the level of a fiduciary relationship. *See DGB, LLC v. Hinds*, 55 So.3d 218, 233 (Ala. 2010) ("A confidential relationship is one in which one person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other's interests . . . ." (citations omitted)). And "if any party relied upon the other as counsel or advisor in this case, it was Defendants upon Woods," who is even referred to as the "Advisor" in the IB Agreement.

Plaintiffs respond by claiming that the defendants breached their fiduciary duties to the plaintiffs as shareholders. Specifically, the plaintiffs state: "The Defendants promised to provide to Plaintiffs 540,000 shares (6%) of Four Star Holdings, Inc." And it was in this capacity that the defendants breached their fiduciary duties. This court does not accept plaintiffs' argument in this regard.

### 6. *Counts IX and X: Negligence and Wantonness.*

Finally, Counts IX and X of the plaintiffs' complaint raise negligence and wantonness claims, respectively. Both counts allege that the defendants' "failure to transfer the subject shares" and "to properly compensate and reimburse" the plaintiffs was the result of the

defendants' negligent or wanton conduct.  In response, defendants argue that "there can be no claim for any negligent or wanton failure to abide by contractual obligations" if there never was a contract, much less a breach of any contractual provision.

As to Counts IX and X, there cannot be a wanton or negligent breach of contract if there is no enforceable contract.  At the October 25, 2011 hearing, the court asked: "What do you say they did which was negligent or wanton?"  The plaintiffs' attorney responded: "They did not give us the shares, your honor."[24]

## C.   Alabama's Door-Closing Statute, Ala. Code § 10A-2-1502 (1975)[25]

Alternatively, the defendants assert that the plaintiffs' entire action is barred pursuant to Alabama's door-closing statute.  *See* Ala. Code § 10A-2-15.02.[26]  Subsection (a) of this statute provides:

> A foreign corporation transacting business in this state without registering as required under Section 10A-1-7.01 or without complying with Chapter 14A of Title 40 may not maintain a proceeding in this state without so registering and complying.  All contracts or agreements made or entered into in this state by foreign corporations prior to registering to transact business in this state shall be held void at the action of the foreign corporation or by any person claiming through or under the foreign corporation by virtue of the contract or agreement; but nothing in this section shall abrogate the equitable rule that he she who seeks equity must do equity.

Ala. Code § 10A-2-15.02(a) (1975).  While defendants concede "that their motion premised upon Alabama's forum closing statute . . . was denied" by the court at the motion to dismiss

---

[24] As the court stated at the October 25, 2011 hearing, there is either a breach of contract or not.  *Compare GE Capital Aviation Services, Inc. v. Pemco World Air Services, Inc.*, No. 1091350 (Ala., Dec. 2, 2011).  A mere breach of contract is not a tort.

[25] This court does not decide this issue.

[26] Section 10A-2-15.02 was formerly codified at Ala. Code § 10-2B-15.02.  *See* Ala. Act 2009-513, pp. 355-57, § 153 (amending former § 10-2B-15.02 and renumbering it as § 10A-2-15.02).  The transfer of former Title 10 to Title 10A went into effect on January 1, 2011.  Ala. Act 2009-513, p. 879, § 376.

stage, it asserts that the factual record is now fully developed and that "it is now undisputed that

Woods's and Cirrus's action[s] were not interstate in nature."  Defendants further concede that

"[a]n exception for the door closing statute exists where foreign corporations engage in solely

interstate commerce in a state."  *See Carbon Processing Co. v. Lapeyrouse Grain Corp.*, 779

F.2d 1541, 1544 (11th Cir. 1986) (per curiam) ("[The plaintiffs'] activities were only in

interstate commerce and that the Alabama qualification statute had no application, since it only

applies to one acting in intrastate commerce.") (application of Alabama qualification statute on a

foreign corporation engaged in interstate commerce, even when contract was made in Alabama,

violates the Commerce Clause).

Defendants aver that the Alabama Supreme Court articulated the "test [for] determining

whether the Alabama door closing statute applies" in *Brown v. Pool Depot, Inc.*, 853 So.2d 181

(Ala. 2002), wherein the court stated:

> *The test of the enforceability of the arbitration clause* . . . is not . . .
> whether the transaction *substantially affects* interstate commerce—which is the
> proper analysis in cases not involving § 10-2B-15.02, see *Sisters of the Visitation
> v. Cochran Plastering Co.*, 775 So.2d 759 (Ala. 2000)—but [is] *whether the main
> or primary purpose of the* [*transaction*] *constitutes an interstate or intrastate
> activity.  Competitive Edge, Inc. v. Tony Moore Buick–GMC, Inc.*, 490 So.2d
> 1242, 1244-45 (Ala. Civ. App. 1986).  See also *SAR Mfg. Co. v. Dumas Bros.
> Mfg. Co.*, 526 F.2d 1283, 1286 (5th Cir. 1976) (applying Alabama law); *Camaro
> [Trading Co. v. Nissei Sangyo America, Ltd.*, 628 So.2d 463 (Ala. 1993)].

*Brown*, 853 So.2d at 185 (alterations and emphasis in original) (internal quotation marks

omitted) (quoting *Cmty. Care of Am. of Ala., Inc. v. Davis*, 850 So.2d 283, 287 (Ala. 2002)).[27]

Moreover, defendants state that "[e]ngagement in interstate commerce, in addition to intrastate

commerce, is no shield to application of the forum closing statute."  *See Tradewinds Envtl.*

---

[27] Defendants omit that the test discussed by the Alabama Supreme Court in *Brown* concerned "*the
enforceability of the arbitration clause.*"  853 So.2d at 185 (emphasis in original) (citation omitted).

*Restoration, Inc. v. Brown Bros. Constr., LLC*, 999 So.2d 875, 879 (Ala. 2008) ("We must then look to the record to determine whether [the foreign corporation] is engaged in intrastate commerce in New Jersey." (quoting *Eli Lilly & Co. v. Sav-On-Drugs, Inc.*, 366 U.S. 276, 279 (1961))).

In light of the foregoing, defendants frame the present issue as "whether Cirrus engaged in intrastate commerce in Alabama," which defendants answer in the affirmative.  To support its view, defendants contend that the services the plaintiffs were to provide the defendants pursuant to the Retainer Agreement "brought a regular and consistent presence of Woods into Alabama, on Four Star's premises, through 2009, and into 2010."  Defendants further aver that "Woods spent at least a hundred days in Alabama" and "his staff was on site more than he was."  In addition defendants argue that "this contract can only be deemed intrastate" because "the contract in this case is not for the provision of material goods, but for services."  *See Brown*, 853 So.2d at 186 ("One area of business is quite clearly defined as intrastate, rather than interstate, activity.  Finally, defendants conclude by stating that the plaintiffs' activities satisfy the requisite threshold for intrastate activities by quoting the following from the Alabama Supreme Court's opinion in *Brown*: "An isolated contract by an unqualified foreign corporation to do localized intrastate business within Alabama is subject to Alabama's door-closing statute even though that contract may require the use of materials and equipment shipped into Alabama from out of state."  *Id.* (citations omitted).

The plaintiffs respond by arguing that the defendants cite the wrong test for determining whether Alabama's door closing statute bars the present action.  They claim that the correct test

was recently articulated by the Alabama Supreme Court in *Ex parte Cohen*, 988 So.2d 508 (Ala.

2008).  In *Cohen*, the Alabama Supreme Court held:

> We first note that at the trial court level there was some question as to whether the relevant test for determining whether the Commerce Clause barred the application of § 10-2B-15.02(a) in this case was: 1) whether the primary purpose of the transaction between Martin and Springland Films was interstate commerce, or 2) whether the transaction between Martin and Springland Films merely *affected* interstate commerce.  Our opinion in *Briarcliff Nursing Home, Inc. v. Turcotte*, 894 So.2d 661, 667 (Ala. 2004), issued after the Supreme Court of the United States decided Citizens Bank v. Alafabco, Inc., 539 U.S. 52 (2003), makes clear that the test in cases involving § 10-2B-15.02(a) remains whether the primary purpose of the transaction constitutes an interstate activity:
>
> > "[I]n *Community Care* [*of America of Alabama, Inc. v. Davis*, 850 So.2d 283 (Ala. 2002)], this Court also stated:
> >
> > > "'The test of the enforceability of the arbitration clause in the Admission Contract in this case is not, as Community Care contends, whether the transaction *substantially affects* interstate commerce—which is the proper analysis in cases not involving § 10-2B-15.02, see *Sisters of the Visitation v. Cochran Plastering Co.*, 775 So.2d 759 (Ala. 2000)—but "whether the main or *primary purpose* of the [transaction] constitutes an interstate or intrastate activity."  *Competitive Edge, Inc. v. Tony Moore Buick-GMC, Inc.*, 490 So.2d 1242, 1244-45 (Ala. Civ. App. 1986).'
> >
> > "*Community Care*, 850 So.2d at 287.  In *Community Care*, Community Care was attempting to enforce a contract (specifically an arbitration provision in the admission contract); however, it was not qualified to do business in Alabama at the time it entered into the admission contract.  This Court held that the penalty of § 10-2B-15.02(a), Ala. Code 1975, extends to the enforcement of arbitration provisions.  *Id.* at 286.  Section 10-2B-15.02(a) is a 'door closing' statute that "'bars a foreign corporation not qualified to do business in Alabama from enforcing in an Alabama court a contract it made in Alabama.'"  *Community Care*, 850 So.2d at 286 (quoting *Hays Corp. v. Bunge Corp.*, 777 So.2d 62, 64 (Ala. 2000)).  Therefore, this Court held that § 10-2B-15.02(a) voided the admission contract and changed the test of the enforceability of the arbitration provision from whether it substantially affects interstate commerce to "'whether the main or

> *primary purpose* of the [transaction] constitutes an interstate or
> intrastate activity.'"  850 So.2d at 287 (quoting *Competitive Edge,
> Inc. v. Tony Moore Buick-GMC, Inc.*, 490 So.2d 1242, 1244-45
> (Ala. Civ. App. 1986)).  The present case does not involve § 10-
> 2B-15.02(a); therefore, the proper test is whether the activity
> substantially affects interstate commerce."

894 So.2d at 667.  Because this case *does* involve 10-2B-15.02(a), the proper test
is accordingly whether the main or primary purpose of the transaction between
Martin and Springland Films constitutes an interstate, or an intrastate, activity.
That, in turn, depends on how the purpose of the transaction is defined.

*Cohen*, 988 So.2d at 513 (alterations and emphasis in original).

Likewise, this case involves § 10A-2-15.02(a); therefore, as the plaintiffs argue, "the

proper test is accordingly whether the main or primary purpose of the transaction between

[Cirrus and Four Star] constitutes an interstate, or an intrastate, activity." *Id.*  The transaction at

issue constituted interstate activity because, as discussed above, it was for the interstate

acquisition and merger of the defendants' company with another publicly traded company.  In

this light, the primary purpose of the transaction clearly constituted interstate activity, and the

plaintiffs' present action is not barred by Alabama's door closing statute.  *See id.* at 514

(rejecting the plaintiff's characterization that "the primary purpose of the transaction as 'the

provision of local labor [by the plaintiff]', which, under Alabama caselaw, would clearly be an

intrastate activity" (citations omitted)).  As stated, this court does not decide this "door closing"

issue.[28]

### CONCLUSIONS OF COURT

At the October 25, 2011 hearing the plaintiffs' attorney acknowledged that the only

possible basis for enforceable contract(s) lies within (1) a letter from Richard Woods to

---

[28]It would appear to this court that the nature of the relationship involved interstate commerce.

31

defendants or principals of defendants dated July 2, 2009, signed by Richard Woods on July 3, 2009 and initialed by various defendants' principals without date;[29] and (2) a document named "Compensation Agreement," not dated.

The July 2 letter described above contains, *inter alia*, the following language:

(1) "PLEASE UNDERSTAND THAT THIS IS A PROPOSAL AND NOT A COMMITMENT TO FUND."  Following this statement are conditions not shown to have occurred.

(2) "This fee shall be deemed earned *at closing*." (Emphasis added).

(3) "Borrower will reimburse . . . ., regardless of whether *final terms and conditions are mutually agreed upon*."  (Emphasis added).

(4) "Lender agrees to limit out-of-pocket expenses to $50,000 *if mutually agreed upon terms* . . . . *cannot be reached by the parties* . . . for which neither party will unreasonably withhold approval . . . . ." (Emphasis added).

(5) "Any additional requirements will be reviewed *and agreed upon* prior to closing."  (Emphasis added).

(6) Borrower shall execute . . . . *acceptable to CIRRUS* . . . . all of which shall contain provisions, representations, covenants . . . . *as are satisfactor*y to CIRRUS."  (Emphasis added).

(7) "Approval is *subject to approval* of the Oversight Stipulation Agreement(s)[30] and all other approvals necessary to protect creditor's interests." (Emphasis added).

(8) *Retained by us*, if *you elect not to do business* with *us*."  (Emphasis partially added).

(9) The following is repeated: "THIS PROPOSAL DOES NOT REPRESENT A COMMITMENT. . . . subject to final approval by our counsel and senior management."

---

[29] There is an apparent incomplete provision provision at the end of the copy furnished to the court.
[30] Not described.

The Compensation Agreement begins, "This Agreement is made effective and executed as of the date below [the court's copy is undated] by and between Novus Acquisition and Development Corp [not a party named in this case] and Cirrus Holdings, Inc. and Richard Woods, individually and collectively, and *both parties* [no defendant in this case is named] agree to terms and conditions set forth hereinafter referred to as Agreement." The court's copy is not dated and is not signed by or on behalf of Cirrus, Novus or Woods.[31] The document concludes with: "Acknowledgement of agreement where shares are earned by Woods, et al at closing of shell acquisition and separately acknowledging facilitating debt/equity funding of *not less than $35M* and *mutually agreeable* debt/equity financing terms:"[32] This "Acknowledgement" is signed but it is not clear who it is signed on behalf of. The language in the "Acknowledgement" is, at best, ambiguous.

The validity of plaintiffs' claims is ultimately to be decided based on whether the plaintiffs had an enforceable contract. The language in the documents leads to the conclusion that they did not. That language reflects that, at best, there were maybe agreements to agree. Under Alabama law such agreements are not enforceable.

In *Howard v. Ryler Truck Rental One-Way, Inc.*, 624 So.2d 169, 170-171, the Supreme Court of Alabama stated:

> "1. The stipulation of May 7, 2987, is merely an agreement to agree to dismissal. The language of the stipulation ('Plaintiff *shall* execute ...' and 'Defendants *will* waive ...' (emphasis added)) indicates action to be taken at some future time. The defendants'

---

[31]There may be another copy which is so completed. There are plaintiffs not named in the agreement. The named plaintiffs are: Cirrus Acquisition and Development Corporation, Cirrus Global Capital Management Inc., Cirrus Holdings, Inc. and Richard Woods. The named defendants are: Four Star Companies, Inc., Dragon's Lair Holdings, Inc., Four Star Holding Company, Inc., Bobby Smith, Jr., and Fran Mize,

[32]There is no evidence that $35M funding was ever available.

waiver does not become effective until plaintiff executes the discontinuance stipulation.   'An agreement to agree later is unenforceable.'  *Dixieland Food Stores, Inc. v. Geddert*, 505 So.2d 371, 383 (Ala. 1987). 'In order to be enforceable, a contract to enter into a future contract must be definite and certain in all its terms and conditions ....'  *Mobil Oil Corp. v. Schlumberger*, 598 So.2d 1341, 1345 (Ala. 1992).  The stipulation of May 7, 1987 contains no language indicating that precise or definite terms were agreed on; rather, it appears that the definite terms of the stipulation of discontinuance were to be agreed on at some later date.[33]

The plaintiffs' claims in Counts IV, V, VI, VII and VIII all depend upon there being enforceable agreements.  They cannot be considered independently of the purported written agreement which state conditions, the need for further agreements and even terms regarding what occurs in the absence of later agreements.  In effect, this court is being asked  to draft a new agreement which somehow states the unrevealed terms that the parties purportedly agreed upon.[34]

The defendants' motion for summary judgment  will be granted.

This the 15th day of December, 2011.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

[33] Also see cases cited in *Dixieland Food Stores*, *supra* at 373.  *Also see White Sands Group v. PRS II, LLC*, 998 So.2d 1042 (Ala. 2008).
[34] The affidavit of Richard Woods filed on October 24, 2011 indicates that the so-called agreements orally changed from time to time.